**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **JAMES HAMILTON,** | * | |
| Plaintiff | * | |
| v. | * | **CIVIL NO. JKB-15-2142** |
| **WILLIAM L. PALLOZZI,** *et al.*, | * | |
| Defendants | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM**

James Hamilton ("Plaintiff") brought an action under 42 U.S.C. § 1983 against William L. Pallozzi in his official capacity as Superintendent of the Maryland State Police ("MSP"), and against Brian E. Frosh in his official capacity as Attorney General of Maryland (collectively, "Defendants"). Plaintiff challenges the constitutionality of certain Maryland statutes that Defendants are charged with enforcing; Plaintiff alleges that these statutes, as applied to him, violate his Second Amendment rights.

Now pending before the Court is Defendants' Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (ECF No. 7.) Also pending is Plaintiff's Motion for Summary Judgment pursuant to Rule 56. (ECF No. 11.) The issues have been briefed, and no hearing is required, *see* Local Rule 105.6 (D. Md. 2014). For the reasons explained below, Plaintiff's Motion will be DENIED, and Defendants' Motion will be GRANTED.

I.   *Background*[1]

Plaintiff, a Maryland resident, was convicted in November 2006 in Rockbridge County, Virginia, of three felony offenses:  credit-card theft in violation of Va. Code Ann. § 18.2-192; credit-card forgery in violation of Va. Code Ann. § 18.2-193; and credit-card fraud in violation of Va. Code Ann. § 18.2-195.  (ECF No. 1 ¶¶ 1, 9.)  Plaintiff received a four-year suspended sentence, and he paid restitution and court costs totaling $2337.90.  (*Id.* ¶ 9.)  Although Plaintiff's felony convictions triggered forfeiture of certain of his political rights in Virginia, those rights were restored in 2013 and 2014.  (*Id.* ¶¶ 9-11.)[2]

According to Plaintiff, in the years following his convictions he has become a "responsible, law-abiding American citizen."  (*Id.* ¶ 15.)[3]  A married father of three children, he serves as head coach of a junior-league wrestling team; he is also an armed security officer registered with the Virginia Department of Criminal Justice Services.  (*Id.* ¶¶ 13-14.)  In spite of his past crimes, Plaintiff alleges that he has "no history of violent behavior."  (*Id.* ¶ 15.)  He wishes to obtain a handgun and a long gun, ostensibly for self-defense purposes within his Maryland home.  Unfortunately for Plaintiff, he is barred from possessing such weapons due to the operation of certain Maryland statutes (collectively, "Firearms Prohibitions").  Specifically, Md. Code Ann., Pub. Safety § 5-133(b)(1) prohibits any person who has been convicted of a

---

[1] Because the Court will resolve this action on Defendants' Motion to Dismiss, the facts are recited here as alleged in the Complaint.  *See Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

[2] Specifically, the Governor of Virginia restored Plaintiff's rights to vote, hold public office, sit on a jury, and serve as a notary (ECF No. 1 ¶ 10), while the Circuit Court for Spotsylvania County, Virginia, restored Plaintiff's right to bear arms (*id.* ¶ 11).  The process for securing restoration of civil rights differs under Maryland law: in Maryland, a "gubernatorial pardon of [a] felony conviction [is] necessary to restore . . . firearm possession rights."  *Washington v. United States*, Crim. No. RWT-11-0380, 2015 WL 4069489, at *1 n.1 (D. Md. July 2, 2015).

[3] Several of Plaintiff's allegations seem at first blush oddly self-congratulatory:  he avers, for instance, that he is neither a fugitive from justice nor a habitual drunkard and that he has never been adjudicated incompetent.  (ECF No. 1 ¶¶ 6-7.)  It turns out, however, that these averments correspond to specific proscriptions on handgun and long-gun possession under Maryland law.  *See* Md. Code Ann., Pub. Safety §§ 5-133, -205.  Of course, the fact that Plaintiff is not barred from possessing regulated weapons under *most* of the enumerated proscriptions has no bearing on the propriety of the *one* proscription that plainly applies to him—conviction of a "disqualifying crime," discussed *infra*.

2

"disqualifying crime" from possessing a "regulated firearm,"[4] while § 5-205(b)(1) forbids any person who has been convicted of such a crime from possessing a rifle or shotgun. The glossary accompanying these statutes defines "disqualifying crime" to include any offense that is classified as a felony in Maryland. § 5-101(g)(2). Two of Plaintiff's Virginia convictions fit within this rubric.[5] Possession of a restricted weapon in violation of the Firearms Prohibitions is a misdemeanor, punishable by a fine and/or incarceration. *See* §§ 5-144(b), -205(d).

At some unspecified point, Plaintiff contacted the MSP Licensing Division to request a Handgun Wear and Carry Permit. (ECF No. 1 ¶ 20.) Plaintiff was advised that, due to his disqualifying convictions, he cannot possess a firearm in Maryland unless he first obtains a full pardon from the Governor of Virginia. (*Id.*) Subsequently, on July 22, 2015, Plaintiff filed the present action under 42 U.S.C. § 1983, claiming that enforcement of the Firearms Prohibitions violates his Second and Fourteenth Amendment rights on an as-applied basis.[6] Plaintiff seeks declaratory and injunctive relief, as well as costs and attorneys' fees.

On October 6, 2015, Defendants moved to dismiss. (ECF No. 7.) Plaintiff filed a response in opposition (ECF No. 10); thereafter, Defendants did not reply within the period prescribed by Local Rule 105.2(a) (D. Md. 2014). Then, on October 26, 2015, Plaintiff moved for summary judgment. (ECF No. 11.) Plaintiff's summary-judgment motion is fully briefed (ECF Nos. 11–1, 14 & 18), and both motions are ripe for decision.

---

[4] Handguns are included on the list of regulated firearms. *See* Md. Code Ann., Pub. Safety § 5-101(r)(1).
[5] Plaintiff acknowledges that Virginia's credit-card forgery statute is equivalent to Maryland's credit-card counterfeiting statute, Md. Code Ann., Crim. Law § 8-205, while Virginia's credit-card fraud statute is equivalent to Maryland's statute proscribing receipt of property by stolen, counterfeit, or misrepresented credit card, § 8-209. Violations of these Maryland statutes would constitute felonies on the facts of Plaintiff's conviction. (*See* ECF No. 1 ¶ 19.) *See also McCloud v. Dep't of State Police*, 44 A.3d 993, 1001 (Md. 2012) (holding that out-of-state convictions are included within the definition of "disqualifying crimes" under the Firearms Prohibitions); *Jones v. State*, 23 A.3d 880, 882 (Md. 2011) (same).
[6] Although Plaintiff cites the Fourteenth Amendment, he does not appear to be raising a freestanding Due Process or Equal Protection claim, and the Court assumes that Plaintiff's Fourteenth Amendment reference is for incorporation purposes only. *See McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010) ("We . . . hold that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in [*District of Columbia v.* ]*Heller*.").

## II. *Standard of Review Under Rule 12(b)(6)*[7]

A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In analyzing a Rule 12(b)(6) motion, the Court views all well-pleaded allegations in the light most favorable to the plaintiff. *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). Nevertheless, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. In conducting its analysis, the Court "need not accept legal conclusions couched as facts or 'unwarranted inferences, unreasonable conclusions, or arguments.'" *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (quoting *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008)).

## III. Analysis

### A. *Constitutional Standing and Ripeness*

Before turning to the merits of Plaintiff's § 1983 claim, the Court must address a justiciability concern that Defendants first raised in their response to Plaintiff's Motion for Summary Judgment.[8] Defendants contend that "Plaintiff's claim is not ripe for adjudication because [he] has not even applied to obtain a handgun carry permit or handgun qualification license and . . . Defendants have taken no action . . . against Plaintiff." (ECF No. 14 at 5.)

---

[7] As noted above, Plaintiff moved for summary judgment shortly after filing his response in opposition to Defendants' Motion to Dismiss. However, the Court concludes herein that Plaintiff failed to state a claim for which relief can be granted. Because of the Court's determination, and because the exhibits appended to the summary-judgment briefs do nothing to alter the Court's analysis, the Court will resolve this matter under Rule 12(b)(6) without conducting a separate and superfluous analysis under Rule 56.

[8] Despite Plaintiff's assertion that "it is too late in the day for Defendants to suddenly claim that their dispute with [Plaintiff] isn't ripe" (ECF No. 18 at 5), ripeness is a jurisdictional matter that "may be raised at any point during the proceedings and may . . . be raised *sua sponte* by the court." *Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 390 (4th Cir. 2004); *see also Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013) ("A claim should be dismissed as unripe if the plaintiff has not yet suffered injury and any future impact 'remains wholly speculative.'" (quoting *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 361 (4th Cir. 1996))), *reh'g denied*, 720 F.3d 212 (4th Cir. 2013), *cert. denied*, 134 S. Ct. 1538 (2014).

Federal courts are courts of limited jurisdiction, the contours of which are circumscribed by the case-or-controversy requirement of Article III.  The doctrines of constitutional standing and ripeness are integral components of that requirement.  To establish standing, "(1) the plaintiff must allege that he or she suffered an actual or threatened injury that is not conjectural or hypothetical[;] (2) the injury must be fairly traceable to the challenged conduct; and (3) a favorable decision must be likely to redress the injury." *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006).  In the context of a preenforcement challenge to a penal statute, a litigant may satisfy constitutional standing where (1) the litigant alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest" but (2) there exists a "credible threat of prosecution" under the challenged law.  *W. Va. Citizens Def. League, Inc. v. City of Martinsburg*, 483 F. App'x 838, 839 (4th Cir. 2012) (per curiam) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).[9]

Ripeness overlaps with standing:  the ripeness doctrine "prevents judicial consideration of issues until a controversy is presented in 'clean-cut and concrete form.'" *Miller*, 462 F.3d at 318-19 (quoting *Rescue Army v. Mun. Court*, 331 U.S. 549, 584 (1947)).  In evaluating ripeness, courts must "'balance the fitness of the issues for judicial decision [with] the hardship to the parties of withholding court consideration.'  A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Id.* at 319 (quoting *Franks v. Ross*, 313 F.3d 184, 194 (4th Cir. 2002)).

The thrust of Defendants' justiciability argument is that the MSP never had an opportunity to formally determine whether Plaintiff qualifies for a handgun license or carry

---

[9] *See also Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 774 n.3 (D. Md. 2014) (finding that plaintiff-challengers to Maryland assault-weapons ban faced credible threat of prosecution and thus brought justiciable claims where they alleged that they possessed banned weapons and would purchase additional banned weapons but for the ban), *vacated in part on other grounds sub nom. Kolbe v. Hogan*, No. 14-1945, 2016 WL 425829 (4th Cir. Feb. 4, 2016).

permit. Had Plaintiff submitted an application, Defendants reason, he would have been subject to a background check—and he might have been denied a license for a reason unrelated to his felony record, mooting his argument in these proceedings. (ECF No. 14 at 7-8.) Plaintiff counters that he "refrained from filling out a useless application" because agents at the MSP Licensing Division *told him* that his application would be futile; the Maryland Office of the Attorney General subsequently confirmed the MSP's position. (ECF No. 18 at 6.)[10]

The Court finds Plaintiff's position here more persuasive. While Defendants speculate that Plaintiff *might* have been denied a license for some unknown reason, they provide no evidence whatsoever in support of their conjecture. Plaintiff, conversely, denies having any disqualifying characteristics other than his felony convictions; in fact, he included pleadings in his Complaint that specifically negate most of the disabling factors under Md. Code Ann., Pub. Safety §§ 5-133, -205. And Defendants never refute Plaintiff's basic assertion—*i.e.*, that because of the Firearms Prohibitions, he is barred from lawfully possessing a handgun or long gun in the State of Maryland. Had Plaintiff gone through the motions of formally applying for a license or carry permit, it is uncontroverted that the MSP would have denied his request. The law does not require Plaintiff to avail himself of a hopeless administrative process before looking to the courts for relief. *See Thetford Props. IV Ltd. P'ship v. U.S. Dep't of Housing & Urban Dev.*, 907 F.2d 445, 449 (4th Cir. 1990) ("To be sure, no litigant is obliged to exhaust inadequate administrative procedures."); *see also Sammon v. N.J. Bd. of Med. Exam'rs*, 66 F.3d 639, 643 (3d Cir. 1995) ("Litigants are not required to make . . . futile gestures to establish ripeness.").

---

[10] To prove his point, Plaintiff supplies a declaration by his former attorney, Margaret Love, as well as an e-mail chain between Ms. Love and Susan Howe Baron, an assistant attorney general in Maryland. (ECF Nos. 18–2 & 18–3.) Although the Court generally confines its analysis to the four corners of the Complaint at the 12(b)(6) stage, the Court may look to extrinsic evidence in determining a threshold justiciability question, *see Neal v. Residential Credit Sols., Inc.*, Civ. No. JKB-11-3707, 2013 WL 428675, at *1 (D. Md. Feb. 1, 2013). Accordingly, the Court has taken notice of Plaintiff's exhibits.

Furthermore, Plaintiff's lawsuit does not challenge Maryland's firearms licensing scheme *per se*; rather, he asks the Court to enjoin enforcement of the Firearms Prohibitions as against him—and specifically those provisions that prohibit firearm possession on the basis of a disqualifying conviction. As Plaintiff aptly observes, "[e]ven if [he] suffered some other firearms disability . . . he could still be prosecuted by Defendants for violating the laws whose application he challenges here." (ECF No. 18 at 8-9.) Conversely, were the Court to grant the declaratory and injunctive relief that Plaintiff seeks, he would be shielded from prosecution under those provisions.

Although Defendants' justiciability argument is unpersuasive, the Court has identified a separate issue that is potentially more problematic. In his Complaint, Plaintiff alleges that the MSP informed him he could not possess a firearm in Maryland "*unless* he were to obtain a full pardon from Virginia's governor." (ECF No. 1 ¶ 20 (emphasis added).) An e-mail chain appended to Plaintiff's summary-judgment reply brief reinforces the possibility of relief via a pardon: Susan Howe Baron, Assistant Attorney General for the Maryland Department of Public Safety and Correctional Services, indicated that "[a]fter [Plaintiff] is pardoned by the Governor of Virginia, Maryland will give effect to the restoration of his rights by Virginia." (ECF No. 18–3 at 1.) However, Plaintiff's former attorney, Margaret Love, indicated in a declaration that a pardon is "not practically available": she did not elaborate on the reasons for such impracticability. (ECF No. 18–2 at 1.)[11]

While applying for a handgun license or carry permit would have been a futile endeavor for Plaintiff at this juncture, the same cannot necessarily be said of a pardon petition. And if

---

[11] The Constitution of Virginia endows the Governor with the power of executive clemency. *See* Va. Const. art. V, § 12. Under current administrative practice, simple pardons are available at the Governor's discretion after the petitioner has (1) fulfilled all conditions associated with his conviction and (2) satisfied a five-year waiting period. *See Simple Pardons*, Off. Secretary Commonwealth, https://commonwealth.virginia.gov/judicial-system/pardons/simple-pardons/ (last visited Feb. 11, 2016).

Plaintiff could have averted the sting of the Firearms Prohibitions by requesting (and securing) executive clemency, it is not clear that his as-applied challenge to the constitutionality of the statutes is properly before the Court: that is, it is not clear that he has *actually* suffered an injury the likes of which the Court is the proper institution to redress.[12]

*Doe v. Virginia Department of State Police* is instructive. 713 F.3d 745 (4th Cir. 2013), *reh'g denied*, 720 F.3d 212 (4th Cir. 2013), *cert. denied*, 134 S. Ct. 1538 (2014). In *Doe*, the plaintiff—who had been convicted decades earlier of "carnal knowledge of a minor"—brought an action under § 1983 to challenge the constitutionality of a state law that had reclassified her crime as a "sexually violent offense," resulting in her exclusion from certain school facilities unless she received permission from both a state court and the school board. Ms. Doe alleged, *inter alia*, that the law interfered with her fundamental right to raise and educate her children as well as with certain of her First Amendment rights. Significantly, however, Doe never filed a petition with any state court or school board. The district court dismissed Doe's case, and the Fourth Circuit affirmed, finding that (1) Doe lacked Article III standing and (2) Doe's claims were not ripe for judicial review.[13] Writing for the majority, Judge Duncan explained that the harms Doe complained of did "not affect her with finality, as she ha[d] not taken any of the steps necessary to access [restricted] properties." *Id.* at 754. "Therefore, any injury to her [constitutional] rights [that] she would suffer from not being able to enter a school . . . remain[ed] hypothetical." *Id.* Similarly, because Doe had not availed herself of the petition

---

[12] The Court is particularly attuned to jurisdictional issues when a litigant invites the Court to invalidate or enjoin the enforcement of a state law, given the weighty federalism concerns implicated by such an exercise of federal judicial power. *Cf. Valenti v. Rockefeller*, 292 F. Supp. 851, 867 (W.D.N.Y. 1968) ("We are . . . aware of the basic principle of federalism which requires that a federal court exercise great caution before striking down a state statute as repugnant to the Constitution."), *aff'd*, 393 U.S. 405 (1969) (per curiam).

[13] Doe brought an additional procedural due process claim that the court addressed on the merits; that claim is not apposite to this discussion.

process under state law, her claims were "dependent on future uncertainties and thus not ripe for judicial decision." *Id.* at 759.[14]

The Court notes the parallels between Ms. Doe's claims and Plaintiff's claim. Both litigants brought § 1983 actions challenging the constitutionality of state laws as applied to them. Moreover, both litigants declined to avail themselves of a state process that, if successful, could have granted them the relief they sought. In light of *Doe*, the Court has reservations about the justiciability and, in particular, the ripeness of Plaintiff's challenge here.

That being said, the Court recognizes that (1) the parties neither discussed the consequences of Plaintiff's failure to petition for clemency nor addressed the relevance of *Doe* in their briefs; and (2) *Doe* may be distinguishable on its facts.[15] The Court also acknowledges Judge King's thoughtful and vigorous dissent in *Doe*, through which Judge King questioned whether the Fourth Circuit had erected an administrative hurdle to § 1983 relief that is improper under *Patsy v. Board of Regents of Florida*, 457 U.S. 496 (1982).[16] The Circuit has not had occasion to revisit *Doe*, and the few district courts that have discussed the case in any detail have distinguished it. For these reasons, and in spite of its reservations, the Court deems it prudent to turn to the merits of Plaintiff's § 1983 claim.

---

[14] Judge Duncan noted the "limited nature" of the court's determination, explaining that, were Doe simply to file a proper petition under state law, the court's justiciability concerns would be addressed. *Doe*, 713 F.3d at 759.

[15] Judge Keenan's concurring opinion in *Doe* illustrates one potentially significant distinction. Citing *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), Judge Keenan explained the principle of administrative finality, which is "concerned with whether [an] initial decisionmaker has arrived at a definitive position on [an] issue that inflicts an actual, concrete injury," *id.* at 193. In *Doe*, the panel concluded that the plaintiff was "required . . . to petition a Virginia circuit court and the local school board, in their capacities as 'initial decisionmaker[s],' to determine whether and under what conditions she [would] be granted access to school property." *Doe*, 713 F.3d at 763 (Keenan, J., concurring) (alteration in original). But in this case, there are two unrelated decisionmakers with separate decisionmaking processes—*i.e.*, the Governor of Virginia and Defendant Frosh. Defendant Frosh (through his agents) has indicated that Plaintiff's firearms rights will be restored *if but only if* he first secures a pardon in Virginia. Perhaps that "decision" is sufficiently final to bring Plaintiff's challenge within the ambit of federal jurisdiction.

[16] In *Patsy*, the Court held that "exhaustion of state administrative remedies [is] not . . . required as a prerequisite to bringing an action pursuant to § 1983." 457 U.S. 496, 516 (1982); *see also Porter v. Nussle*, 534 U.S. 516, 523 (2002) ("Ordinarily, plaintiffs pursuing civil rights claims under 42 U.S.C. § 1983 need not exhaust administrative remedies before filing suit in court.").

B.  *§ 1983 Claim*

   1.  *Legal Framework*

Plaintiff asserts that application of the Firearms Prohibitions as against him violates his Second Amendment rights. He seeks declaratory and injunctive relief via § 1983, which provides that any person who, under color of state law, "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights . . . secured by the Constitution . . . shall be liable to the party injured in an action at law, *suit in equity*, or other proper proceeding for redress" (emphasis added).

Until recently, the nature and extent of the Second Amendment right was ill-defined. But in *District of Columbia v. Heller*, 554 U.S. 570, 599 (2008), the Supreme Court held that self-defense is the "*central component*" of the right. According to *Heller*, foremost among the interests protected by the Second Amendment is the "right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. *Heller* clarified, however, that the self-defense right is not unlimited, and the Court specifically advised that nothing in its opinion should be taken to cast doubt on "presumptively lawful regulatory measures" such as "longstanding prohibitions on the possession of firearms by felons." *Id.* at 626 & 627 n.26. Two years after *Heller*, the Court held that the Second Amendment right—and its concomitant limitations[17]—is "fully applicable to the States." *McDonald v. City of Chicago*, 561 U.S. 742, 748 (2010).

In the aftermath of *Heller* and *McDonald*, the Fourth Circuit—along with appellate courts nationwide—began developing a framework through which district courts might evaluate Second Amendment challenges to firearms regulations. In *United States v. Chester*, 628 F.3d 673 (4th

---

[17] "We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons' . . . . We repeat those assurances here. . . . [I]ncorporation does not imperil every law regulating firearms." *McDonald*, 561 U.S. at 786 (citation omitted).

Cir. 2010), the Circuit set forth a two-prong approach. When faced with a Second Amendment challenge, a court must first determine "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id.* at 680 (quoting *United States v. Marzzarella*, 64 F.3d 85, 89 (3d Cir. 2010)). If the law *does* burden a Second Amendment interest, the court must move to the "second step of applying an appropriate form of means-end scrutiny." *Id.* *Chester* held that the proper degree of scrutiny turns on whether the interest implicated falls within the "core right identified in *Heller*—the right of a *law-abiding*, *responsible* citizen to possess and carry a weapon for self-defense." *Id.* at 683. For persons who, by virtue of their criminal history, do not qualify as law-abiding, responsible citizens, intermediate scrutiny is the appropriate standard of review. *Id.*[18] Under the intermediate scrutiny standard, "the government must demonstrate . . . that there is a 'reasonable fit' between the challenged regulation and a 'substantial' government objective." *Id.* (quoting *Bd. of Trs. v. Fox*, 492 U.S. 469, 480 (1989)).

Picking up where *Chester* left off, the Fourth Circuit in *United States v. Moore*, 666 F.3d 313 (4th Cir. 2012), confronted a repeat offender's challenge to his conviction for violating the Gun Control Act of 1968 ("GCA"), as amended, 18 U.S.C. §§ 921 *et seq.* The GCA makes it unlawful for any person "who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year" to possess a firearm or ammunition in or affecting commerce. § 922(g)(1). The appellant in *Moore* had multiple felony convictions on his record, bringing him well within the purview of § 922(g)(1); he argued, however, that the statute

---

[18] Nothing in the Fourth Circuit's most recent Second Amendment decision, *Kolbe v. Hogan*, No. 14-1945, 2016 WL 425829 (4th Cir. Feb. 4, 2016), alters this analysis. Though *Kolbe* held that strict scrutiny is the appropriate standard of review for a challenge to Maryland's assault-weapons ban, it did so only after recognizing that the ban "implicates the core protection of the Second Amendment—'the right of law-abiding responsible citizens to use arms in defense of hearth and home.'" *Id.* at *1 (quoting *Dist. of Columbia v. Heller*, 554 U.S. 570, 635 (2008)). Where a law restricts firearm access for convicted criminals, the law does not implicate *Heller*'s "core protection," and strict scrutiny is inappropriate.

violated his Second Amendment rights. The *Moore* court began its analysis by acknowledging that every circuit court of appeals to consider the constitutionality of § 922(g)(1), whether through a facial attack or an as-applied challenge, has upheld the statute.[19] The court next explained that, because § 922(g)(1) falls within the scope of "presumptively lawful regulatory measures" under *Heller*, a facial challenge to the statute cannot succeed. *Moore*, 666 F.3d at 318. Nevertheless, picking up on dicta in *Chester*,[20] *Moore* recognized that a felon could—*theoretically*—prevail in an as-applied attack on such a presumptively valid law. In order to succeed, the felon would have to "show that his factual circumstances remove his challenge from the realm of ordinary challenges." *Id.* at 319. Although *Moore* offered little guidance on what might constitute such an exceptional set of factual circumstances, the court flatly rejected the appellant's challenge in that case, noting that his "extensive and violent criminal history" moved his conduct "plainly outside the scope of the Second Amendment." *Id.* at 320.

Following *Moore*, the Fourth Circuit has repeatedly upheld § 922(g)(1) and other provisions of the GCA in the face of constitutional attack. *See, e.g.*, *United States v. Taylor*, 594 F. App'x 784, 790 (4th Cir. 2014) (per curiam) (rejecting challenge to § 922(g)(1)), *cert. denied*, 135 S. Ct. 2339 (2015); *United States v. Izaguirre–De La Cruz*, 510 F. App'x 233, 234 (4th Cir. 2013) (per curiam) (rejecting challenge to § 922(g)(5), which proscribes firearm possession by

---

[19] As of this writing, the circuit courts of appeals have continued to speak with one voice, unanimously upholding § 922(g)(1) in the face of Second Amendment attacks. *See, e.g.*, *United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011); *United States v. Bogle*, 717 F.3d 281, 281-82 (2d Cir. 2013) (mem.); *Bell v. United States*, 574 F. App'x 59, 60 (3d Cir. 2014) (mem.), *cert. denied*, 135 S. Ct. 693 (2014); *United States v. Taylor*, 594 F. App'x 784, 790 (4th Cir. 2014) (per curiam), *cert. denied*, 135 S. Ct. 2339 (2015); *United States v. Powell*, 574 F. App'x 390, 397 (5th Cir. 2014) (per curiam), *cert. denied*, 135 S. Ct. 767 (2014); *United States v. Griffin*, 476 F. App'x 592, 598 (6th Cir. 2011); *United States v. Shields*, 789 F.3d 733, 750-51 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 420 (2015); *United States v. Siegrist*, 595 F. App'x 666, 667-68 (8th Cir. 2015) (mem.); *Van Der Hule v. Holder*, 759 F.3d 1043, 1051 (9th Cir. 2014); *United States v. Molina*, 484 F. App'x 276, 285-86 (10th Cir. 2012); *United States v. Ponce-Cortes*, 574 F. App'x 876, 876-77 (11th Cir. 2014) (mem.); *Schrader v. Holder*, 704 F.3d 980, 991 (D.C. Cir. 2013).
[20] *Chester* had suggested that *Heller*'s reference to *presumptively lawful* regulatory measures "suggests the possibility that one or more of these 'longstanding' regulations 'could be unconstitutional in the face of an as-applied challenge.'" *United States v. Chester*, 628 F.3d 673, 679 (4th Cir. 2010) (quoting *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010)).

an illegal alien); *United States v. Larson*, 502 F. App'x 336, 339 (4th Cir. 2013) (per curiam) (rejecting challenge to § 922(g)(8), which proscribes firearm possession by a person subject to a restraining order); *United States v. Elkins*, 495 F. App'x 330, 333 (4th Cir. 2012) (per curiam) (same); *United States v. Mudlock*, 483 F. App'x 823, 828 (4th Cir. 2012) (per curiam) (same).

In this case, of course, Plaintiff is not challenging the GCA; rather, he assails Maryland's Firearms Prohibitions as applied to him. The case law construing the constitutionality of the Firearms Prohibitions is admittedly quite sparse.[21] But because of the material overlap between § 922(g)(1) and the Firearms Prohibitions (both of which prohibit gun possession by felons), the GCA case law is relevant to the Court's present analysis. Accordingly, the Court will apply the *Chester–Moore* framework in evaluating the plausibility of Plaintiff's § 1983 claim.

2. *Application*

Because the Firearms Prohibitions, as felon-disarmament statutes, are included within that class of regulatory measures that is presumptively lawful under *Heller*, the burden is on Plaintiff in the first instance to rebut the presumption of lawfulness. Before the Court even considers whether the Firearms Prohibitions as applied to Plaintiff are reasonably tailored to a substantial government objective, *Chester*, 628 F.3d at 683, Plaintiff must demonstrate that "his factual circumstances remove his challenge from the realm of ordinary challenges," *Moore*, 666 F.3d at 319. But taking Plaintiff's Complaint at face value, he has failed to plausibly allege that he "fall[s] within the category of citizens to which the *Heller* court ascribed the Second Amendment protection of 'the right of *law-abiding responsible* citizens to use arms in defense of hearth and home.'" *Id.* (quoting

---

[21] *But see Spencer v. State*, No. 1164, 2015 WL 6108245, at *9 (Md. Ct. Spec. App. Oct. 15, 2015) ("§ 5-133 is exactly the type of regulatory measure prohibiting the possession of firearms by those convicted of a disqualifying crime that the Supreme Court stated that its holdings in *McDonald* and *Heller* did not touch. As a result, . . . § 5-133 does not violate the Second Amendment." (citation omitted)).

*Heller*, 554 U.S. at 635). Consequently, the Court can resolve this dispute—and dismiss Plaintiff's Complaint—without undertaking a complicated means-ends inquiry.[22]

Plaintiff's theory is, at bottom, a simple one: he sees himself as a "responsible, law-abiding American citizen" with "no history of violent behavior, or of any other conduct that would suggest he would pose any more danger by possessing firearms than an average, law-abiding responsible citizen." (ECF No. 1 ¶ 15.)[23] The problem, of course, is that Plaintiff is *not* an average, law-abiding, responsible citizen: he is a felon who was convicted not ten years ago of three serious crimes. Although the particular statutes that Plaintiff violated are directed toward misappropriation of credit cards, the underlying misconduct is the kind of misconduct that the law has proscribed from time immemorial. Plaintiff's crimes are not technical or regulatory offenses: they are black-letter *mala in se* felonies reflecting grave misjudgment and maladjustment.[24]

While Plaintiff emphasizes the nonviolent nature of his crimes, studies show a statistically significant risk that persons who commit property crimes may engage in other maladaptive behaviors. For instance, a 2014 study published by the Bureau of Justice Statistics, which tracked recidivism patterns of 404,638 state prisoners released in 2005, found that 82.1%

---

[22] Given that the Fourth Circuit has continually upheld the GCA in the face of constitutional attack (even at prong two of the *Chester* test) the Court has little doubt that the Firearms Prohibitions would likewise survive intermediate scrutiny. But the Court need not ultimately decide that question—because taking Plaintiff's allegations as true, he cannot carry his burden at prong one.

[23] Elsewhere, Plaintiff declares that he is "plainly not a typical felon." (ECF No. 11–1 at 9.) Given the wide array of culpable acts and omissions that can give rise to a felony conviction, the Court is unsure what it means to be a "typical" felon. In any event, in emphasizing his (allegedly) nonviolent history and his (alleged) rehabilitation, Plaintiff would deflect attention from his three grave offenses of conviction. But it is those felonies that bring Plaintiff's factual circumstances squarely within the "realm of ordinary challenges" to the Firearms Prohibitions, *see United States v. Moore*, 666 F.3d 313, 319 (4th Cir. 2012).

[24] Theft crimes are as old as the Babylonian Code of Hammurabi. *See* John D. Bessler, *Revisiting Beccaria's Vision: The Enlightenment, America's Death Penalty, and the Abolition Movement*, 4 Nw. J.L. & Soc. Pol'y 195, 216 (2009). Fraud crimes likewise date back centuries; in 1601, for example, the Star Chamber in *Twyne's Case* concluded that "fraud and deceit abound in these days more than in former times" and that, consequently, "all statutes made against fraud should be liberally and beneficially expounded to suppress the fraud." 76 Eng. Rep. 809, 815-16; 3 Co. Rep. 80 a, 82 a–82 b (K.B.). Forgery, too, is a crime deeply rooted in the common law. *See Union Bank v. Barker*, 3 Barb. Ch. 358, 359 (1848) (describing fraud by means of forgery as an "offence involving the highest degree of moral turpitude, which . . . has long . . . been made a felony by our statutes").

of former property offenders were arrested for a new offense within five years following their release.[25] Notably, while 54% of former property offenders committed subsequent property offenses during that five-year period, 28.5% of former property offenders committed subsequent violent offenses.[26] *Cf. United States v. Barton*, 633 F.3d 168, 175 (3d Cir. 2011) ("[D]enying felons the right to possess firearms is entirely consistent with the purpose of the Second Amendment to maintain 'the security of a free State.' It is well-established that felons are more likely to commit violent crimes than are other law-abiding citizens." (citation omitted)).

For that matter, courts in this Circuit and elsewhere have repeatedly rejected Second Amendment challenges to disarmament statutes brought by felons with nonviolent offenses of conviction. *See United States v. Pruess*, 703 F.3d 242, 247 (4th Cir. 2012) ("We now join our sister circuits in holding that application of the felon-in-possession prohibition to allegedly non-violent felons like Pruess does not violate the Second Amendment."); *United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004) ("Irrespective of whether his offense was violent in nature, a felon has shown manifest disregard for the rights of others. He may not justly complain of the limitation on his liberty when his possession of firearms would otherwise threaten the security of his fellow citizens."); *see also United States v. Kline*, 494 F. App'x 323, 325 (4th Cir. 2012) (per curiam) (rejecting challenge by felon convicted of eluding a law-enforcement officer); *United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011) (rejecting challenge by felon convicted of drug offenses); *Wilson v. United States*, No. 4:14-CV-158-A, 2014 WL 2445788, at *2 (N.D. Tex. May 30, 2014) (rejecting challenge by felon convicted of mail fraud).[27]

---

[25] Matthew R. Durose et al., U.S. Dep't of Justice, Bureau of Justice Statistics, *Recidivism of Prisoners Released in 30 States in 2005: Patterns from 2005 to 2010*, at 8 (2014), http://www.bjs.gov/content/pub/pdf/rprts05p0510.pdf.
[26] *Id.* at 9.
[27] Plaintiff pins his hopes on two cases litigated by Plaintiff's counsel and recently decided by district courts in Pennsylvania: *Suarez v. Holder*, No. 1:14-CV-968, 2015 WL 685889 (M.D. Penn. Feb. 18, 2015), and *Binderup v. Holder*, No. 13-cv-06750, 2014 WL 4764424 (E.D. Pa. Sept. 25, 2014). In both cases, the courts departed from the overwhelming current of authority and approved as-applied challenges to § 922(g)(1). Both cases are pending on

The point of this discussion is not, of course, to impugn Plaintiff's motives or even to assess his rehabilitation. Assuming the truth of Plaintiff's allegations, it appears that he has made a number of commendable, socially responsible choices in the years following his convictions, and he has been rewarded for those choices (*e.g.*, by the restoration of his civil rights in Virginia). That said, because of Plaintiff's criminal past, the State of Maryland has acted well within its discretion in choosing to withhold firearms privileges from him—at least until he obtains a full pardon under Virginia law. Plaintiff has not shown that his factual circumstances "remove his challenge from the realm of ordinary challenges," *Moore*, 666 F.3d at 319. Accordingly, he has not carried—*and cannot carry*—his burden at *Chester* prong one, and the Court will dismiss his § 1983 claim.

## IV. Conclusion

For the foregoing reasons, an Order shall enter DENYING Plaintiff's Motion for Summary Judgment (ECF No. 11); GRANTING Defendants' Motion to Dismiss (ECF No. 7); DISMISSING WITH PREJUDICE Plaintiff's § 1983 claim; and CLOSING THIS CASE.

DATED this 18th day of February, 2016.

BY THE COURT:

/s/
James K. Bredar
United States District Judge

---

appeal, so they have limited persuasive value at this point. Moreover, regardless how the Third Circuit rules in *Suarez* and *Binderup*, those cases are factually distinguishable from the case at bar. In *Suarez*, the plaintiff's predicate offense was a nearly 25-year-old conviction for carrying a handgun without a license, a regulatory misdemeanor under state law. In *Binderup*, the plaintiff's predicate offense was a 16-year-old conviction for corruption of minors, also a misdemeanor under state law. In this case, by contrast, Plaintiff's predicate offenses were felonies under Virginia law, and he committed them within the past decade.